The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before former Deputy Commissioner Bernadine S. Ballance. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act. Defendant-employer is self-insured and United Self Insured Services was the servicing agent at the time this claim arose.
2. An employer-employee relationship existed between plaintiff and defendant-employer on 5 May 1993.
3. Plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer on 5 May 1993.
4. Plaintiff's average weekly wage was $227.52 on 5 May 1993.
5. The following stipulation was submitted as evidence by the parties after the hearing in lieu of deposing Jerry Fonke, D.C. "Maria Ragazzone first came under my care on 4 October 1994, and at that time, in my opinion, she was capable of performing light-duty work. Since that time, she has improved from a chiropractic standpoint, and she remains under my care presently."
6. The following exhibits were admitted as evidence by stipulation of the parties:
 a. Stipulated Exhibit A — Records from Doctors Urgent Care Center, 16 pages;
 b. Stipulated Exhibit B — Records of Dr. Donald A. Nisbett, 8 pages;
 c. Stipulated Exhibit C — Record from First Med., 1 page;
 d. Stipulated Exhibit D — Records from Pinehurst Surgical Clinic, 7 pages;
 e. Stipulated Exhibit E — Records from Cape Fear Valley Medical Center, 17 pages;
 f. Stipulated Exhibit F (a) — Records from Cumberland County Mental Health Center, 67 pages;
 g. Stipulated Exhibit F (b) — Records from Cumberland County Mental Health, 147 pages;
 h. Stipulated Exhibit G — I.C. Form documents, correspondence, medical records, 23 pages;
 i. Stipulated Exhibit H — Accident Inv. Report, 1 page;
 j. Stipulated Exhibit I — Records of Highsmith Rainey Memorial Hospital, 11 pages; and
 k. Stipulated Exhibit J — Medical Records of Moore Regional Hospital, 2 pages.
***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACTS
1. At the time of hearing, plaintiff was a 56-year-old Hispanic female who began employment with defendant-employer on 14 May 1990 as a dietary aide. Plaintiff was a good employee and had earned an "employee of the year" award while working for defendant-employer.
2. On 2 May 1993, plaintiff sustained a compensable injury resulting from a fall. Plaintiff was delivering a tray of food to a patient when her foot struck a bed crank which was protruding out from the side of a bed causing her to fall to the floor on her right side. Plaintiff immediately felt pain up and down the right side of her body.
3. Due to lack of transportation, plaintiff was unable to obtain medical treatment until the following day when she got a friend to take her to Doctors Urgent Care where she was treated by Dr. Morton Metzer who diagnosed right shoulder contusion. He released plaintiff to return to light duty work on the same day with restrictions of no heavy lifting or pulling with the right arm. Upon her return to work, plaintiff was assigned her regular duties which required heavy lifting and pulling with the right arm. Plaintiff returned to Doctors Urgent Care on 9 May 1993 complaining of pain in the right shoulder and muscle spasms in her neck and shoulder. Plaintiff had not been able to get her prescription filled and the doctor took her out of work at said time.
4. Plaintiff was treated conservatively. Cervical neck x-rays showed degenerative disk disease with nerve encroachment on the right side. By 22 June 1993, plaintiff had symptoms of motor and sensory abnormalities and Dr. Resnick felt that an MRI and neurosurgery referral were necessary. Dr. Resnick opined that although plaintiff probably had the degenerative disk disease previously, the encroached nerve and her deteriorating motor and sensory abnormalities were directly related to the injury to her shoulder from the fall at work. Dr. Resnick further recommended that plaintiff not return to work until her follow-up with a neurosurgeon was completed.
5. Although plaintiff lived in Fayetteville and had no transportation, defendant made an appointment for plaintiff to see Dr. Donald Nisbett of Laurinburg who is a general practitioner and not a neurosurgeon. Plaintiff was also told that she could not return to Doctors Urgent Care for treatment.
6. Plaintiff's claim was not accepted as compensable until 3 August 1993 and the Form 21 Agreement was submitted for approval to the Industrial Commission in October, 1993. This agreement stated that disability began on 22 June 1993. Plaintiff had been taken out of work initially from 9 May 1993 through 16 May 1993. Plaintiff was required to take sick and vacation leave during said period. Plaintiff's disability during said period is compensable.
7. Plaintiff was evaluated by Dr. Donald Alvin Nisbett on 24 June 1993 upon referral from the director of the nursing home where she worked. Plaintiff complained of pain in her neck and shoulder. Dr. Nisbett obtained an MRI of the cervical spine on 28 June 1993 which showed findings consistent with C5-6 disc protrusion. Dr. Nisbett opined that plaintiff's injury of 5 May 1993 was responsible for her pain and that plaintiff's compensable fall could have aggravated some pre-existing degenerative arthritis. Plaintiff was unable due to transportation problems to return to Dr. Nisbett for further treatment after 6 July 1993. As of 6 July 1993 plaintiff was unable to work due to her work related injury, according to Dr. Nisbett.
8. As of 22 June 1993, plaintiff became totally unable to work due to her work injury and defendant had made no effort to determine compensability, although defendant was directing plaintiff's medical care.
9. Plaintiff filed a Form 18 Notice of Accident on 25 June 1993 with the Industrial Commission. Defendant did not file a Form 19 Employer's Report of Injury until 13 August 1993, even though defendant was aware of plaintiff's injury based upon the "Accident Investigation Report Employee Description" dated 5 May 1993, signed by plaintiff and witnessed by Gregory A. Brown.
10. After being out of work for several weeks without the benefit of workers' compensation, plaintiff began to experience severe financial difficulties, a threatened eviction and was in fact subsequently evicted from her home. Plaintiff became severely depressed and sought treatment at the Cumberland County Mental Health Center.
11. Tom Reicheld, a staff psychologist at Cumberland Mental Health, counseled plaintiff on 2 August 1993. At said time, plaintiff was wearing a neck brace, crying a lot and worried about housing problems. Plaintiff also reported an inability to sleep and hearing voices. On her 9 August 1993 visit, plaintiff reported that she was living in the street. Her depression had increased, she had suicidal ideation; very poor concentration and memory and expressed a feeling of hopelessness. Plaintiff related her depression onset to the receipt of eviction papers. Tom Reicheld diagnosed "major depression recurrent with psychotic features". Plaintiff was referred to a psychiatrist and was voluntarily hospitalized at the Roxy Treatment Center. Upon her hospital discharge on 24 August 1993, plaintiff continued to receive individual supportive psychotherapy with Tom Reicheld and was later transferred for care to a partial hospitalization program.
12. Plaintiff continued to experience signs of depression and continued to require treatment for depression three times a week through 11 January 1994. Plaintiff was also going to the Roxy Center partial hospitalization program five days per week as an out patient.
13. After plaintiff had been evicted from her home and during the time she was still being treated for her depression and other mental impairments, defendant decided to accept plaintiff's claim as compensable. Defendant thereafter referred plaintiff to the First Med Family Medicine and Urgent Care Center on 3 September 1993 for treatment for persistent neck pain, shoulder pain, low back pain and other physiological symptoms caused by her 5 May 1993 fall. First Med recommended that plaintiff have a neurological/orthopedic consultation and defendant referred her to Dr. Mark E. Brenner, an orthopedic surgeon, on 30 September 1993. After his first examination of plaintiff, Dr. Brenner found that plaintiff sustained cervical spine and lumbar spine strains which were superimposed upon underlying pre-existing degenerative osteoarthritis and that her clinical presentation was consistent with a cervical and lumbar strain historically related to her work accident. Dr. Brenner further opined that plaintiff was capable of working as of 5 October 1993 with the following restrictions: avoidance of strenuous physical activities that require bending, stooping, lifting or twisting and avoid activities that require strenuous use of the upper extremities. Dr. Brenner was not aware of plaintiff's hospitalization and treatment by Cumberland Mental Health for depression.
14. Dr. Brenner was not plaintiff's primary treating physician; he was retained to do an evaluation which included the 30 September 1993 evaluation and a 21 February 1994 follow-up evaluation. At plaintiff's follow-up visit she continued to experience discomfort in her cervical spine and lumbar spine. She also had symptoms of ulnar nerve entrapment at the elbow, numbness and tingling in the fourth and fifth finger of her right arm which were not causally related to her compensable injury.
15. As of 21 February 1994, Dr. Brenner felt that plaintiff was orthopedically capable of performing only in a light duty capacity with the same restrictions stated in paragraph 13 above.
16. Dr. Brenner approved a job on 20 October 1993 for plaintiff based upon a job description presented to him by defendant. Dr. Brenner did not recall ever communicating to plaintiff that she was released to return to light duty work.
17. Although Dr. Brenner suspected that plaintiff was exhibiting exaggerated pain symptoms, he saw plaintiff only twice, he did not begin to treat plaintiff until approximately 5 months after her injury; he did not know plaintiff's pain threshold and he did not use those resources available to quantify whether plaintiff was in fact malingering. No weight is accorded the opinion of Dr. Brenner on the issue of whether plaintiff was exaggerating her pain symptoms.
18. Based upon Dr. Brenner's approval of a light duty job for plaintiff, Michelle Harris, the administrator at Whispering Pines Nursing Home (defendant-employer), called plaintiff and told her to report to work on 26 October 1993 because Dr. Brenner had signed a light duty job description for her. Plaintiff, who speaks limited English, was confused. Dr. Brenner had not told her she could return to work. Plaintiff asked Ms. Harris to call her lawyer. Plaintiff gave Ms. Harris her lawyer's name and spelled the name. Ms. Harris stated in a letter to plaintiff dated 25 October 1993, three days later, that she could not understand plaintiff's pronunciation or spelling of her lawyer's name and had not received any confirmation that plaintiff was represented by an attorney. Ms. Harris mailed plaintiff a copy of the job description on or about 25 October 1993. Ms. Harris also sent a letter on 25 October 1993 to her self-insured carrier stating that plaintiff refused to return to work and also advised that plaintiff said she had a lawyer. Based upon the above described communication with plaintiff, defendant filed a Form 24 Application of Employer or Insurance Carrier to Stop Payment of Compensation with the Industrial Commission on 5 November 1993. Said application was approved on 29 November 1993 by the Industrial Commission.
19. Under the circumstances as described above, defendant-employer's telephone call to plaintiff did not constitute a clear offer of light duty employment and plaintiff's response did not constitute a refusal of suitable employment. Defendant-employer's follow-up letter to plaintiff dated 25 October 1993 with the light duty job description was not a written offer of employment. The Form 24 Application of Employer or Insurance Carrier to Stop Payment of Compensation was improvidently approved.
20. Although plaintiff had some pre-existing depression which was not disabling and had been asymptomatic for more than 2 years, plaintiff's depression and related mental problems in July, 1993 were causally related to plaintiff's inability to work and financial problems caused by her 5 May 1993 compensable injury. According to Tom Reicheld, plaintiff's loss of income due to inability to work and her eviction from her home definitely increased her depression.
21. Although plaintiff was physically capable of performing light duty work as of 20 October 1993, plaintiff's mental impairment resulting from her injury caused her to continue to be incapable of earning wages in any employment at said time. Plaintiff was receiving individual psychotherapy through Tom Reicheld and taking three medications for her depression. She was going to partial hospitalization support services through mental health three times per week and was still having auditory hallucinations.
22. Plaintiff began individual counseling with Dr. Frank Nuzum, a certified rehabilitation counselor, in April, 1994. According to Dr. Nuzum, plaintiff continued to suffer from an "adjustment disorder with depressed mood" at the time he began to treat her.
23. Based upon plaintiff's medication/psychiatric evaluations by Dr. Honi Gluck of Cumberland County Mental Health, plaintiff's mental condition was relatively stable as of 25 April 1994. At said time, plaintiff was alert and oriented. Her mood and affect were mildly depressed and there was no evidence of psychotic symptomology.
24. Although plaintiff was only mildly depressed as of 25 April 1994, there is no evidence that she was capable of earning wages in any employment at said time or any time thereafter.
25. Plaintiff's average weekly wage on 5 May 1993 was $227.52 which yields a compensation rate of $151.76. Plaintiff was paid at the rate of $133.33 per week under the Form 21 Agreement; however, this issue was preserved for later determination in said agreement.
***********
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On 5 May 1993, plaintiff sustained an admittedly compensable back injury by accident arising out of and in the course of employment with defendant-employer. N.C. Gen. Stat. § 97-2 (6).
2. As a result of plaintiff's inability to work, due to said injury, her loss of all income during the six-to-eight week period when defendant would not accept her claim as compensable, and the anxiety associated with her financial crisis including sudden homelessness due to eviction from her home, plaintiff significantly aggravated her pre-existing non-disabling depression. Plaintiff's physical impairment resulting from her compensable injury and her subsequent disabling depression and mood disorder caused her to become totally unable to earn wages in any employment from 9 May 1993 through 15 May 1993 and from 22 June 1993 through 25 April 1994. Plaintiff's mental condition stabilized by 25 April 1994 such that she was only mildly depressed; however, there was no evidence presented on whether plaintiff was employable after 25 April 1994. The burden of proof is on defendant on this issue. Radica v. Carolina Mills, 113 N.C. App. 440,439 S.E.2d 185 (1994).
3. Although plaintiff was physically capable of performing light duty work with restrictions on or about 20 October 1994, plaintiff remained totally incapable of earning wages in any employment at said time due to limitations caused by her mental impairment. Plaintiff's disability due to depression and associated mood disorders is compensable.
4. The Form 24 Application of Employer or Insurance Carrier to Stop Payment of Compensation was improvidently approved in that plaintiff was unable to work at the time of approval due to a pre-existing mental condition that was significantly aggravated by her workplace injury. Also, defendant has not proven by the greater weight of the evidence that plaintiff refused suitable employment. The Industrial Commission's approval of the Form 24 Application of Employer or Insurance Carrier to Stop Payment of Compensation to plaintiff should be vacated.
5. Plaintiff is entitled to temporary total disability compensation from 9 May 1993 through 15 May 1993 and from 22 June 1993 and continuing to the date of hearing and thereafter until she returns to work earning her pre-injury wages or until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to payment by defendant for all medical treatment necessitated by her compensable injury, including treatment for her mental impairments for so long as such examinations, treatments and evaluations are reasonably required to effect a cure, provide relief and/or lessen her disability. N.C. Gen. Stat. § 97-25.
7. Plaintiff's average weekly wage at the time of injury was $227.52.
*********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Subject to an attorney's fee hereinafter awarded, defendant shall pay to plaintiff temporary total disability compensation at the rate of $151.76 per week from 9 May 1993 through 15 May 1993 and from 22 June 1993 through the date of hearing and continuing thereafter until she returns to work or until further Order of the Industrial Commission. Any amounts which have accrued shall be paid in a lump sum. Defendants are allowed a credit for all temporary total disability compensation previously paid to plaintiff.
2. Defendant shall pay all reasonable and related medical expenses incurred or to be incurred by plaintiff as a result of her injury, including treatment for mental illness, when bills for same are submitted to defendant and approved through procedures adopted by the Industrial Commission.
3. A reasonable attorney's fee of twenty-five percent (25%) of the amount awarded plaintiff herein is hereby approved for plaintiff's attorney and shall be deducted from any accrued amount due plaintiff and paid directly to plaintiff's attorney. Thereafter, every fourth future compensation check due plaintiff shall be paid directly to plaintiff's attorney.
4. Defendant shall pay the costs of this action.
************
ORDER
The Form 24 Application of Employer or Insurance Carrier to Stop Payment of Compensation approved on 29 November 1993 is hereby VACATED.
FOR THE FULL COMMISSION
 S/ ____________________________ COY M. VANCE COMMISSIONER
CONCURRING: S/ ____________________________ THOMAS J. BOLCH COMMISSIONER
S/ ____________________________ LAURA K. MAVRETIC COMMISSIONER
CMV/cnp/mj 8/23/96